493 So.2d 1304 (1986)
Webster Lee FOSTER
v.
STATE of Mississippi.
No. 55650.
Supreme Court of Mississippi.
September 10, 1986.
Ralph M. Dean, Oxford, for appellant.
*1305 Edwin Lloyd Pittman, Atty. Gen. by Pat Flynn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and DAN M. LEE and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
Once again we are faced with an appeal involving a breach of Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice. This rule is becoming the problem child of our state jurisprudence. Such a development is puzzling. The rule's requirements are neither confusing nor onerous; yet we are continually confronted with cases in which law enforcement officials have failed to comply with it. It is irritating to have to reverse criminal convictions because of mistakes which could so easily be avoided, but cases like the present one leave us little choice.
At 9:00 a.m. on June 4, 1982, Elliott's Jewelry Store in Oxford opened for the day's business. Shortly thereafter, a lone black male wearing a brown polyester shirt and a fishing hat entered the store and asked to see some men's diamond rings. The sales clerk produced some for his inspection, whereupon he drew a pistol and said he would take the lot. After securing his loot, he fled the store on foot. Police were summoned immediately. Proceeding down what he considered the likeliest escape route, an officer discovered a brown polyester shirt and a fishing cap lying on the ground.
On the same day, the sales clerk prepared a composite sketch of the robber with the help of the Oxford police. This composite was widely circulated through northern Mississippi.
Two months after the robbery, the Oxford police received a report from the Highway Patrol that a man resembling the composite had entered a jewelry store in Batesville and fled after seeing the sales clerk consult the composite. The jeweler gave chase and was able to get the description of the man's car, as well as the tag number. The car turned out to be registered to "James Foster."
A few days later, an Oxford police officer was on the town square when he observed a man driving a car that answered the description from the Batesville incident. In his opinion, the driver closely resembled the composite sketch of the robber. Police stopped the car and told the driver, Webster Lee Foster, to drive to the station. He was not arrested, nor was he given the reason for his detention. When he arrived at the station, he was placed in a line-up wearing a fishing hat like the one seen on the robber. A citizen viewing this line-up identified Foster as the perpetrator of the robbery of an Oxford drug store. He was booked for this crime, and a routine search of his person revealed a pawnbroker's ticket for a man's diamond ring of the type taken during the jewelry store robbery, whereupon Foster was charged with that crime also.
The sales clerk did not see the line-up, being out of town at the time. However, when shown a photo of the lineup, she picked out Foster as the robber, and repeated this identification in court with great conviction.
After a jury trial, Foster was found guilty of armed robbery and sentenced to twenty years' imprisonment.

LAW
Foster assigns the line-up as error, in that it was impermissibly suggestive. It can hardly be denied that the Oxford police used very poor judgment in conducting it. The defendant was the only participant wearing the distinctive fishing hat referred to by the robbery victim. The explanation given was that the police did not have hats for the other participants, but in that case, Foster should have taken part without a hat.
Appellant contends that the sales clerk's in-court identification of Foster was tainted because she had been shown a picture of this line-up. Under our jurisprudence, however, the mere fact that a line-up *1306 was suggestive does not of itself compel such a result, unless under the totality of the circumstances, the impropriety gave rise to "a very substantial likelihood of irreparable misidentification." York v. State, 413 So.2d 1372, 1383 (Miss. 1982). Having reviewed the circumstances of this robbery and the testimony of the sales clerk, we consider it highly unlikely that she could be mistaken in her identification of the robber. We therefore reject this assignment of error.
Foster also argues that the state violated Rule 4.06 by failing to disclose the existence of certain discoverable material to the defendant or the court.
This material came to light during the cross-examination of G.A. Liles, the police officer who responded to the call about the robbery and discovered the fishing hat and shirt. The pertinent section of the testimony is as follows:
Q. Officer Liles, you state the hat was marked by the crime lab. Would you please explain who the crime lab is.
A. Jackson Crime Lab, Mississippi Crime Lab in Jackson.
Q. What purpose was that hat so marked?
A. The hat was sent to the crime lab along with the shirt.
Q. For what purpose?
A. To try to determine if there was any hair in it.
Q. Do you have the results of those tests?
A. I have a letter back.
Q. Pardon me?
A. Yes sir.
Q. Could I see it?
A. I don't have it with me. I can tell you what it says.
Q. Please enlighten me.
A. All it says is there was negroid hair present.
Q. It didn't say Webster Lee Foster's hair, did it?
A. No, sir, they didn't say it was Webster Lee Foster's hair. They just 
Q. Isn't it a fact that you took a hair sample from Webster Lee Foster in the jail?
A. That's correct.
Q. What did you do with that hair sample?
A. Sent it to the crime lab.
Q. Did you get test results on it?
A. Yes, but there wasn't any way that they could tell.
Q. Pardon?
A. They couldn't match the hairs, the hair wasn't 
Q. Are you testifying, I want to know what the results were, what did they say?
A. I am trying to tell you, if you will let me.
Q. You said they couldn't match it.
A. I said all they could tell us was that the hair in the hat and the shirt was of a black male, just like the hair sample, known hair sample that we sent was from a black male and that was the extent of what they could tell us.
Q. They didn't say it was Webster Lee Foster's hair, did they?
A. They didn't say either one of them was Webster Lee Foster's hair.
Q. But you do put the name on a sample you send down there.
A. I had the name on the known sample, yes.
MR. DEAN: I would like to see the, if the court will indulge me a moment, I would like to see the results of this, this is the first I found out about this, too.
MR. COLEMAN: Your Honor, now Mr. Dean knows that the state didn't offer anything into evidence about this. He elicited this on cross examination. Therefore, the state had no responsibility to make him aware of anything. Mr. Liles has testified to everything the report says, that all such a test can *1307 reflect is the fact it was a male hair, black male, that's all the report says.
THE COURT: Just a minute. Mr. Dean, I have not a motion.
MR. DEAN: Defendant would ask this court to order the state's witness to produce the test results from Exhibit Nine and the test results on the hair sample taken from Webster Lee Foster.
THE COURT: Ladies and gentlemen, go to the jury room.
There followed a long discussion of whether or not the report could be considered exculpatory within the meaning of Rule 4.06, after which the court overruled the defense motion. Defense counsel dropped the issue and began cross examining Liles about another matter.
Rule 4.06 reads in part:
DISCOVERY: The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial;
(2) Copy of any recorded statement of the defendants to any law enforcement officer.
(3) Copy of the criminal record of the defendant, if proposed to be used to impeach;
(4) Copy of crime lab reports or report or any tests made;
(5) Exhibit any physical evidence and photos to be offered in evidence; and
(6) Copy of any exculpatory material concerning defendant.
Upon a showing of materiality to the preparation of the defense, the court may require such other discovery to defense counsel as justice may require.
Thus, it becomes apparent that the entire discussion of whether the material in the present case could be deemed exculpatory, is irrelevant, since the rule imposes an independent obligation under subsection 4 to disclose crime lab reports or any tests made, whether or not they are exculpatory. Fuselier v. State, 468 So.2d 45, 56 (Miss. 1985).
It was therefore error for the trial court to overrule the defense motion in this matter. The question is, what was the effect of that error?
The state cites a number of cases for the proposition that reversal for discovery violations of this nature is proper only where prejudice is shown. With one exception, all of these cases antedate the adoption of Rule 4.06. The exception is Bracy v. State, 396 So.2d 632 (Miss. 1981), in which portions of a report filed by a narcotics officer were withheld from the defense. The Court in that case refused to reverse because the portions of the report withheld "contain nothing ... that would have helped the defense or might have affected the outcome of the trial." (396 So.2d at 636). But Bracy differs from the present case in that the trial court and this Court reached that conclusion after examining the report. In the present case, the report was simply not seen by the trial court or this Court. The only testimony as to the content of the report was that given by Officer Liles. Obviously, it will not do for the state to withhold lab reports and then offer the unsupported testimony of its own witnesses as establishing their content.
In recent years this Court has produced a substantial body of law on Rule 4.06, but with the exception of Bracy, all of it has dealt with undisclosed material which was offered into evidence by the state. Bracy is the only case cited dealing with undisclosed evidence not offered into evidence by either party.
In State v. Grocost, 355 N.W.2d 32, (Iowa 1984), certain reports were neither furnished to the defendant nor used at trial. When the defendant protested this on appeal, the Iowa court held that the defendant had no right to the gratification of his "demands that the state's files be rummaged for unidentified alleged exculpatory evidence" (355 N.W.2d at 37). On the other hand, Rhode Island has a set of criminal *1308 procedure rules which, like ours, require the disclosure on request of all results or reports from tests. R.I. Rules Crim. Proc. 16(a)(5). In State v. Adams, 481 A.2d 718 (R.I. 1984), a discoverable report was compiled but the prosecutors did not disclose it to the defense attorneys because they decided not to use it at trial. The Rhode Island Supreme Court held that the rule "does not make disclosure of such reports contingent upon whether the state intends to use such a report at trial," and held that such a violation required reversal without any showing of prejudice to the defendant. (481 A.2d at 724).
We think the Rhode Island approach is the better rule, in that it prevents the state from acting as judge in its own cause on the issue of discoverability. We have already expressed our preference in such matters. In Hentz v. State, 489 So.2d 1386 (Miss. 1986) defense counsel, during trial, learned of the existence of certain tapes not turned over during discovery. The state argued that this material did not come under Rule 4.06 because the state did not use it at trial and because (in the state's judgment) it was not exculpatory. We held to the contrary:
An important question in discovery ... is who is going to determine whether or not tapes and written instruments are exculpatory or important to the defense, if counsel is unable to see, hear, or know what is contained therein? Is the state attorney the only person who will make that determination? We think not. The court now declares that ... prosecuting attorneys should make available to attorney for defendants all such material in their files and let the defense attorney determine whether or not the material is useful in the defense of the case. 489 So.2d at 1388.
It is not necessary for us to adopt a per se reversal rule for such violations. In cases where the material in question is available for the trial judge's inspection or for inspection by this Court on appeal, and such examination can determine beyond reasonable doubt that the matter complained of could not have affected the outcome, reversal may not be necessary. But in a case like the present one, where neither the trial judge nor this Court ever saw the disputed material, but must rely entirely on the word of a prosecution witness as to its content, there is simply no way out; we must reverse, as we do now.
The other assignments of error are without merit.
REVERSED AND REMANDED.
ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and GRIFFIN, JJ., concur.
HAWKINS, P.J., and WALKER, C.J., dissent.
HAWKINS, Presiding Justice, dissenting:
While the record in this case suggests no more than simple oversight in failing to furnish Foster a copy of a crime lab report, apparently totally innocuous and of no benefit to either side, I agree with the majority that its production was required under Rule 4.06. I also agree the circuit judge erred in failing to order the state to produce it at trial.
I wring my hands with the majority with prosecuting attorneys failing to abide by discovery rules. Virtually all of them involve pre-trial failure to disclose relevant evidence, however. See: Fuselier v. State, 468 So.2d 45, 55 (Miss. 1985); Barnes v. State, 460 So.2d 126, 133 (Miss. 1984); Harris v. State, 446 So.2d 585, 588 (Miss. 1984); Morris v. State, 436 So.2d 1381, 1384; Box v. State, 437 So.2d 19, 21 (Miss. 1983); McNeil v. State, 308 So.2d 236, 241 (Miss. 1975). There is something approaching chicanery or the sinister when a prosecuting attorney fails to make a pre-trial disclosure of relevant evidence in the face of a court order.
In this case when the defense brought out the crime lab report in its cross-examination of Officer Lyles, the entire thrust of the ensuing examination was to show conclusively to the jury that the report did not implicate Foster in any way.
*1309 When defense counsel moved to direct the state to furnish him a copy of the report, the circuit court conducted a hearing in chambers. The prosecuting attorney vigorously objected on the ground that the report was not exculpatory, a determination the state had made unilaterally, thus making a clear-cut violation as was condemned in Hentz v. State, 489 So.2d 1386 (Miss. 1986). The court then overruled defense counsel's motion to produce.
Significantly, the following then appears in the record:
MR. DEAN: May I ask this while the jury is still out. Can I just see it?
MR. COLEMAN: I want to look at it, I haven't seen it before I will agree to give it to the lawyer.
Foster was convicted on July 20, 1983. On July 29, 1983, there was a thorough pre-sentence hearing in which the defendant and his counsel participated at length. On August 29, 1983, Foster filed a motion for a new trial.
Foster was represented by an experienced trial attorney. The motion for a new trial filed over a month following Foster's conviction is slightly over two pages in length and sets out ten reasons in support of the motion. It makes no mention of error in failing to produce the crime lab report, which is strongly indicative, in my view, that defense counsel had fully satisfied himself that the report was of no benefit to his client.
Had counsel made any mention of the crime lab report in his motion for a new trial the circuit judge would have had the opportunity to direct its production and Foster in turn would have had the opportunity to examine it and determine if, in any way, shape, form or fashion he had been injured by the jury not seeing it. I have no doubt that if Foster had assigned this failure to produce in his motion for a new trial the circuit judge would not have denied him the opportunity to inspect the report, if in fact he had not already seen it. If the report helped Foster in any way, then the circuit judge would have been obligated to grant a new trial. That would have obviated this appeal. On the other hand, if the report was manifestly innocuous, this issue would be removed from this appeal.
I cannot fathom Foster's counsel ignoring this salient point in his motion for a new trial if he thought the report contained a remote possibility of benefitting his client.
The very purpose of a motion for a new trial is to give the trial judge an opportunity to correct errors, obviating the time and expense of an appeal. See: Robinson v. State, 345 So.2d 1044, 1046 (Miss. 1977). We have also held that unless the error of the trial court is assigned in a motion for a new trial, that point is waived on appeal. See: Fuller v. State, 468 So.2d 68, 71 (Miss. 1985); Robinson v. State, supra; Mississippi State Highway Comm. v. Rives, 271 So.2d 725, 729 (Miss. 1973); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 486 (Miss. 1972).
Conceding then, that the trial court committed error by overruling Foster's motion to produce a copy of the crime lab report, this does not terminate the inquiry, because a defense attorney is obligated to specifically point out this error in his motion for a new trial. Fulfillment of this obligation is a pre-requisite to any claim of error on appeal.
By reversing under the facts of this case we are saying to trial attorneys: you can forget your obligation to point out any error to the circuit judge in a motion for a new trial. You risk nothing in waiting to assign the error for the first time on appeal (the fourth and last assignment of error in Foster's appeal). In doing so, this Court encourages appeals which could be avoided. The rationale, the very purpose, of a motion for a new trial, is being frustrated. Our next step might as well be to dispense with the necessity of filing a motion for a new trial.
This case is distinguishable from Hentz, supra, where the state and trial judge examined and determined that discoverable material was not exculpatory, but would *1310 not permit defense counsel to examine it, and the point was preserved for appeal.
In Box v. State, 437 So.2d 19, 21 (Miss. 1983), we stated we were not hide bound to reverse every case in which there had been a discovery violation. This is such a case in my view, thus I would affirm.
By affirming I would have no hesitancy in stating that no post-conviction opportunity be denied Foster to obtain a copy of this report for possible benefit, and if so, prompt and appropriate relief be given him. Hill v. State, 432 So.2d 427, (Miss. 1983).
WALKER, C.J., joins this opinion.