517 So.2d 1364 (1987)
Richard GALLION
v.
STATE of Mississippi.
No. 57035.
Supreme Court of Mississippi.
September 23, 1987.
Rehearing Denied January 13, 1988.
Jerry L. Mills, Richard C. Williams, Jr., Pyle, Harris, Dreher, Mills & Woods, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by H.M. Ray, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and DAN M. LEE and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the court:
Richard Gallion appeals from his conviction of armed robbery in the circuit court *1365 of the First Judicial District of Hinds County and sentence to life imprisonment.
Only one issue of substance is presented on this appeal, whether the State's use of photographs not shown to defense counsel prior to trial constituted a discovery violation of Uniform Criminal Rule 4.06 requiring reversal. Under the circumstances of this case we find it did not, and affirm.

FACTS
On October 19, 1981, the Poindexter branch of the First National Bank, located in downtown Jackson, was robbed by two males of approximately $19,400. The men entered the bank around 10:00 a.m. and proceeded to the window of the head teller Ethel Fisher. One of the men, wearing a lady's sheer blue scarf over his face, stepped up to the window and asked for money. The other man, who was wearing a straw hat, pointed a pistol at Fisher while the first man stuffed money in a bag. After taking funds from Fisher, the "bag man" proceeded to the teller window of Pamela Roberts, and under pistol threat took money from her. Fisher identified the defendant, Richard Gallion, as the "bag man."
Bank teller Brenda Burse Walker testified that the gunman wore black clothes and a straw hat, and the bag man wore a blue scarf, blue shirt and slacks, and a light blue knit hat. Walker identified Richard Gallion as the bag man. (At the first trial, Walker had stated that Richard was the gunman. R. 70)
Bank secretary Inez Little testified that the bagman wore a light blue shirt, darker pants, a chiffon-like scarf, and a straw hat. Little testified that the gunman had black pants and a shirt. Little identified Richard Gallion as the bagman and noted that he had put on weight.
Bank customer A.D. Montgomery testified that the bagman wore a powder blue ski cap, a blue veil, and dark blue clothes. Montgomery identified Richard Gallion as the gunman.
Although there were some discrepancies by the witnesses as to clothing worn by the defendant, all eyewitnesses identified Richard Gallion as one of the two men participating in the bank robbery that day. The other robber was M.C. Gallion, a brother of the defendant.
Detective C.M. Crisco recovered a portion of a sheer blue scarf and other items of clothing while searching the basement of an abandoned house next door to the residence of Gallion's sister, Hilda Gallion. Inside the trousers appeared the names "M.C. Gallion, Michael Gallion, M.C. John Gallion" marked with a laundry pencil. At trial, Fisher and Walker recognized the clothing as resembling that worn by the men who robbed the bank.
Richard Gallion denied robbing the bank. He testified that on the morning of October 19, 1981, he walked from his car to Hilda's house around 8:15, and went with his sister and her children to the Unifirst Bank, leaving about 9:30. Gallion stated that he remained in the car with his sister's children while she went inside to make a withdrawal. Hilda corroborated Richard's alibi. Unifirst Bank records also revealed evidence that Hilda did make a $10.00 withdrawal from Unifirst Bank at 9:51 a.m. on that date.
Gallion testified that he had only two or three dollars when he went to the bank with his sister, but when he was arrested later that day he had $164 in cash on his person. Gallion was convicted of armed robbery and sentenced to life in the custody of the Mississippi Department of Corrections.

LAW

I.

A NEW TWIST TO RULE 4.06.
Rule 4.06 of the Uniform Criminal Rules provides, in pertinent part:
DISCOVERY
The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph *1366 upon request and without further order the following:
* * * * * *
(5) Exhibit any physical evidence and photos to be offered in evidence; and
(6) Copy of any exculpatory material concerning defendant.
Defense counsel's August 15, 1985, letter to the prosecution contained the following paragraphs:
Further, you advised me that the photographs taken during the actual commission of the robbery had been destroyed by the Jackson Police Department.
If I have made any incorrect statements regarding our discussion in conference, please advise me immediately.
The photographs referred to by defense counsel were Polaroid snapshots taken from a videotape made by the bank's surveillance camera. During trial Officer Crisco did in fact testify that the photographs were never used or tagged as evidence because of their poor quality.
We now factually detail how the bank's video and the photographs therefrom create the Rule 4.06 violation issue on this appeal.
The opening statement of defense counsel contained the following comments:
The testimony that will be presented to you is, because of the age of this case, recollection of events that is four years old and there's going to be one really important piece of evidence that Mr. Peters didn't mention to you today and I want you to keep this in mind as the evidence is presented. That's photographs. This is a bank robbery. There were electronic cameras in the bank at the time. There were pictures being taken. We expect the evidence to show that the photographs were obtained, that they were turned over to the State of Mississippi and that those photographs will not be presented to you today for your inspection and view. You will not have the opportunity to look at the unforgetting eye of a camera. You will be asked to look through  and I think Mr. Peters used the lying eyes this morning  those pictures show what happened. They would show how people were dressed. They would show whether they had masks on it, masks over their face  whether they could, in fact, have been identified as the witnesses tell you. They would show heights of witnesses, approximate weights of witnesses, locations of customers, who was where. There was a record that would not require  would not ask people who were under severe stress, having a gun pointed at them  to come into court four years later and rely on their memory to send a man to the penitentiary the rest of his life. We ask that you listen to those witnesses' testimony carefully and that you keep in the back of your mind where are the photographs. [Emphasis added]
Vol. I, pp. 11-12
During cross-examination of bank teller Ethel Fisher, Gallion's attorney asked the following:
Q. You have been asked about the various security devices in the bank. There were cameras, in fact, operating during this whole bank robbery, were there not, please, ma'am?
A. That's correct.
* * * * * *
Q. And you have had a chance to view those pictures since the bank robbery, haven't you?
A. In '81 I did.
Q. And you recall when you did view them that those were clear  some of them were pretty good and some of them were fuzzy, but some of them were fairly distinct photographs, weren't they?
A. That's correct.
Q. And they, of course, showed the type clothing that the robbers were wearing, didn't they?
A. That's correct.
* * * * * *
Q. And those photographs, I believe were turned over to the Jackson Police *1367 Department after the robbery, weren't they?
A. That's correct.
Q. And that's the last you have seen of them. Is that right?
A. That's right.
Fisher was then asked to describe what Gallion was wearing the day of the robbery, but was unable to do so.
During direct examination of Officer Crisco, he testified that photographs were taken, but they were of poor quality. Crisco stated that he did not know where the photographs were at the time he was testifying. On cross-examination, Crisco admitted that the photographs showed the location of the participants in the robbery, but did not recall whether or not the photographs were used in the investigation of the case.
At the beginning of the second day of trial, the following proceedings were had:
BY MR. PETERS:
May it please the Court, yesterday Detective Charles Crisco was asked on the stand by defense counsel where a security film was that was taken of the robbery in progress. [Note: this question was asked by the State.] And Detective Crisco at that time stated he was not aware of where that film was. He has since determined that the film was in the possession of Don Wimberly of the First National Bank and I'm certain, if defense counsel calls them, they will make that available to him. If not, I will assist him in getting it.
BY THE DEFENSE:
Your Honor, for the record, also we would like to state that we requested the right to inspect these photographs pursuant to Rule 4.06 at a conference with Ms. Bennett in the District Attorney's office. At that time, we were advised that the photographs taken during the actual commission of the robbery had been destroyed by the Jackson Police Department.
BY THE STATE:
And that's true. The film that they have [sic] has been destroyed; however, we learned yesterday that First National Bank keeps all of those film in a vault.
BY THE COURT:
All right. In the event, Mr. Mills, that you feel you need an opportunity to examine these films, I'll give you that opportunity.
BY THE DEFENSE:
Your Honor, we certainly would need it in view of the response from the District Attorney's office that the photographs have been destroyed.
BY THE COURT:
All right.
BY THE STATE:
I have been trying to call them to see if they can do it without a subpoena, Your Honor.
BY THE COURT:
Thank you.
BY THE STATE:
We have called and we feel sure the bank will furnish that without a subpoena, Your Honor.
BY THE COURT:
All right.
BY THE DEFENSE:
Your Honor, we have a motion for a mistrial at this time.
* * * * * *
BY THE DEFENSE:
Comes now the defendant, Richard Gallion, and moves the Court for a mistrial and, in support thereof, would show that, during the discovery process in this case, there was a request made to the District Attorney's office, in particular Patricia Bennett, for the production of the photographs taken during the actual commission of the robbery. That, during the discovery conference, Ms. Bennett advised counsel for the defendant that the photographs taken during the actual commission of the robbery. [sic] That, during the discovery conference, Ms. Bennett advised counsel for the defendant that the photographs taken during the actual commission of the robbery had been destroyed by the Jackson Police Department. In support of our position, we would ask that my letter to Ms. Bennett *1368 which sets out the details of that conference be offered in support of the motion. We would show that the defendant has adopted a trial strategy as a result of the representation of the District Attorney's office that evidence has been destroyed; that the opening statement has been premised upon the unavailability of these photographs; that the District Attorney's office had the capability to determine that the photographs were in existence but that, in fact, a misstatement was made leading counsel for the defendant to believe that the photographs had been destroyed. We are placed in a position at this point in not being able to go back to the jury after we have announced our strategy in opening statement. We would be prejudiced if there was a change at this point.
* * * * * *
BY THE STATE:
My understanding is, Your Honor, that certain photographs were made from the film and these photographs were in the possession of the Jackson Police Department. They were determined to be of such poor quality that they were of no benefit and they were destroyed by the Jackson Police Department. particularly they were destroyed by the Jackson Police Department once this defendant was convicted and appealed to the Supreme Court and some four years later the case is now coming to trial. We just learned this morning that the video film is, in fact, in the possession of the First National Bank and we advised the defense attorneys of this. If, in fact, the defense attorneys feel that they have been unduly prejudiced, we have no problem with giving them a mistrial.
* * * * * *
BY THE DEFENSE:
Counsel for the defense was never advised of the situation where photographs were photographs were taken from the cameras and that the actual photographs were still in existence. We were led to believe that the photographs had been destroyed and would be unavailable in any form. We again submit that the District Attorney's office had the same knowledge or had the potential to gain the same knowledge at the time these representations were made as today.
BY THE COURT:
All right. I'll reserve ruling on the motion. I am going to give the defense the opportunity  and I will take the same opportunity  to observe the video along with the prosecution and I will determine at that time whether I feel there could be any prejudice. In the meantime, I intend to continue with the trial. Do you have any further evidence?
Following the testimony of the State's last witness in its case in chief, the State rested without offering any photographic evidence of the bank robbery. After the overruling of defendant's motion for directed verdict, the following proceedings occurred:
BY THE DEFENSE:
At this point in time, we are still caught in a quandry [sic] as to how we are going to proceed due to the surprise brought by the revelation from the State that some photographs exist. We would like to have the opportunity before we proceed  to this point, we have been denied the right to cross examine the State's witnesses with respect to the photographs and would certainly like to have that right to utilize that evidence if it exists and for the balance of our case to at least have the opportunity to review it.
BY THE COURT:
I will take a recess until such time as the video tape has arrived... .
BY THE STATE:
I would like for the record to reflect that Don Wimberly and Larry Robinson with the First National Bank have appeared with the video equipment and with the tape showing the robbery in progress. That this has been inspected by the defendant and his counsel and the Court. That the Court has requested that photographs of the video tape portion pertaining to the robbery and showing the robbers be made  pictures of that portion of the video be made for appellate purposes. That the video *1369 equipment is set up in the courtroom and operable for the jury to see if the defense attorney so desires. That the defense attorneys have waived the privilege of placing this evidence before the jury and have requested that it not be shown to the jury on their behalf and, for that reason, it is not being shown to the jury. The State is ready, willing and able to afford the defense attorneys at no cost or expense for the video to be played before the jury and they have waived that right.
BY THE DEFENSE:
And in response, we would like to say that we have not had this available to us at a time that we cross examined the witnesses presented by the State. There has been testimony as to the time that these witnesses had to observe the perpetration of the crime and the video tape does show that it was significantly less time available. We have been cut off by the late production of this evidence from making our proper defense through cross examination of the witnesses and having the opportunity to show to the jury that they had significantly less time to observe the facial features that they testified to. That have not been given sufficient time to make a determination that satisfies the defendant as to whether clarification or enhancement of the photographs cans [sic] be made to the point sufficient to enable us to proceed with the matter. That the prosecution had knowledge of the existence of the photographs. That they failed to make the disclosure despite the request and, in fact, represented to the defense that the photographs had been destroyed. That the defense in its opening statement irrevocably committed to a position that the State had destroyed the photographs and it would be prejudice by being forced to go forward at this point.
BY THE COURT:
After having heard the arguments and seeing the video tape, it's the opinion of the Court that the video tapes do not contain any exculpatory matter. That, in the viewing of the video tapes by the jury, in my opinion, would not change the outcome of the trial. It is my opinion that the video tapes do not benefit the defense. In fact, I think the video tapes would probably have aided the prosecution's case. I believe that the fact that the prosecution has at this late date found these videos enures to the benefit of the defendant rather than to his prejudice and that they have elected not to introduce the tapes in their case in chief. For those and other reasons that need not be stated in detail, I will overrule the motion for a new trial. Copies or photographs of the particular frames showing the participants in the crime on this video will be made and made a part of the record for appellate purposes. [Emphasis added]
* * * * * *
BY THE STATE:
May it please the Court, I would like for the record to show that, as to the defendant's ability to cross examine witnesses with these tapes, we are perfectly willing and will produce each of the State's witnesses that the defense wants to cross examine  place them back on the stand and he can cross examine them with this evidence if he so desires. As relates to the time sequence as shown in the video tapes, it is now available to him for him to show to the jury if he cares to show the time sequence and availability of identification of witnesses. With regard to the State's knowledge of this tape, the State did not have knowledge of it and, if it had had knowledge of it, we would have offered it as its own evidence and the only reason we are not offering it as a State's exhibit is because we didn't give the defense attorney prior notice of this because we didn't know about it and, as relates to the destroyed photographs, I have determined, in fact, that the photographs available to the Police Department were, in fact, destroyed.
* * * * * *
BY THE DEFENSE:
We would request additional time at this point to make a determination as to whether the photographs could be enhanced *1370 to the point that they could provide probative evidence in favor of the defendant, Your Honor.
BY THE COURT:
In the event you find that these photographs could be enhanced and provide probative evidence, in my opinion, that would be new evidence that you were not aware of prior to trial and would be grounds for a new trial. I cannot see halting this trial at this point on that mere possibility so the motion at this point is denied. You will have to show me first that they can be enhanced and proved and be probative evidence.
When Gallion took the stand in his defense, his attorney had him try on the clothes worn by the bagman to show that the clothes were too small. Gallion testified that he weighed 183 pounds. On cross-examination, the State had Gallion read his weight that was on the line-up card, which was 170 pounds. At that point the District Attorney sought to introduce the photographs into evidence and the following proceedings were had:
BY THE DEFENSE:
Your Honor, it's our feeling at this time the District Attorney is about to attempt to introduce the photographs which have previously been discussed in this matter. These were previously requested by the defense. I think the basis of our motion has been made earlier. It's our belief that the submission of these photographs and any questioning therefrom would be extremely prejudicial to Mr. Gallion's defense at this point. We would therefore request that the photographs not be utilized in any way.
BY THE COURT:
For what purpose will you be using the photographs?
BY THE STATE:
To show the clothing on the defendant as being tight, Your Honor, and fitting him the same way that it fits him now  virtually the way it fits him now  to show the difference in the thirteen pounds of weight and the way the clothing fits in these photographs. Now, if I might, I would to respond to his motion, Your Honor.
The defense attorney has objected, moved for mistrials, moved for continuance, done everything within his power to try to say that we didn't make these pictures available for him and for the jury to see. We are now moving to introduce these pictures into evidence for him to see and for the jury to see and for everybody to have and he's making the same motion. He can't ask for both things. He's got to have one or the other. The other thing is that evidence is excluded under Rule 4.06 if we didn't furnish it to them if we offer it as an exhibit in our case in chief. We are using this as rebuttal of this witness's testimony. We are not offering it as an exhibit in our case in chief. [Emphasis added]
BY THE DEFENSE:
Your Honor, again we have irretrievably taken the position that the photographs were destroyed by the Police Department based upon the statements of the District Attorney's office. We restate our position that they had a duty to provide them and believe that it would be reversible error and prejudicial. We were told that no photographs were available. We did not have the opportunity to cross examine the State's witnesses from these photographs and we renew our motion at this time, Your Honor.
BY THE COURT:
All right. I think that the photographs can be properly used in rebuttal. They were previously marked as Appellate exhibits.
Rule 4.06 serves two dissimilar purposes. The first is to give the defendant an opportunity well in advance of trial to learn all evidence the State is going to offer in support its case. Whatever evidence the State proposes to offer to convict him, he is entitled to discover well in advance of trial. This is to prevent surprise, or "trial by ambush."
The other purpose is quite different. The defendant is also entitled to examine *1371 and get a copy of any material which would tend to prove him innocent. 4.06(a)(6).
In analyzing this case, these two basic dissimilar purposes of Rule 4.06 must be borne in mind.
A video tape was made of the robbers during the course of the robbery. From this tape some Polaroid pictures were made by either the bank or the Jackson Police Department, and the Jackson Police Department for a time had these Polaroid pictures taken from portions of the tape. Someone with the police department concluded the pictures were of such poor quality as to be useless. They were discarded. Whether they were discarded prior to or following the first trial is not shown. In any event no robbery pictures were offered in evidence at the first trial. Gallion's first conviction was reversed by this Court. Gallion v. State, 469 So.2d 1247 (Miss. 1985).
Gallion was represented on his first appeal and his second trial by the same law firm.
Prior to the second trial, in response to Gallion's request, a State's attorney responded that the photographs in the possession of the Jackson Police Department had been destroyed. This was factually correct, of course. Whether the two attorneys knew the pictures the Jackson Police Department had were in turn Polaroid pictures of a tape still in possession of the bank is not shown.
Of course, when defense counsel was apprised the pictures had been destroyed, he knew that no pictures taken during the robbery would be, or could be offered by the State to incriminate his client. He already knew no pictures had been offered at the first trial.
The Jackson Police Department obviously had viewed the pictures as useless to either party. This is why they were discarded. Defense counsel nevertheless endeavored to cast a pall of suspicion over the police department's destruction of the pictures. He chose to insinuate to the jury that the pictures would prove his client innocent. According to Gallion's counsel, this particularly significant, important evidence which had been in the State's possession would not be produced before the jury. He asked the jury to keep in the back of its mind, "Where are the photographs?"
The State listened to these insinuations made by defense counsel in his opening statement and in his cross-examination of State's witnesses throughout the first day of trial.
No doubt the State got aroused over this issue the defense was making over the lack of photographs, and sought to find out from the bank if there were others. The district attorney then learned the bank had a video type. (Why both attorneys did not already know this is strange.)
On the second morning of trial, the district attorney announced to the court in chambers that the bank did in fact have a video tape, and that it would be made available to defense counsel.
There followed a colloquy between the court and counsel, and then the defendant made a motion for a mistrial because the defense "trial strategy" had been upset because of this development. The court overruled the motion for a mistrial, but granted defense counsel the opportunity to look at the video tape. The video tape was brought to court and defense counsel had an opportunity to look at it. Defense counsel obviously thought the tape was not exculpatory for his client, because he made no effort to offer it into evidence.
The first part of rule 4.06  advance notice of incriminating evidence  clearly was not involved at this point in the trial proceedings. The State had no intention of offering any such photographs into evidence. What about the other reason for the rule? Would the photographs have tended to prove Gallion innocent, or were they, as the State said, useless?
Clearly the tape was not exculpatory, because, as noted, after viewing it defense counsel chose not to offer it into evidence before the jury.
The only value of this tape (or the photographs from it) was the "trial strategy" of the defense to insinuate to the jury that the *1372 State had destroyed evidence which would have proved his client innocent.
The State cannot be faulted for correcting before the jury this accusation with no basis in fact.
Clearly no reversible error had occurred at that stage of the trial because of a Rule 4.06 violation. The State had not attempted to offer any portion of the tape to the jury, and therefore defense could not complain about the State offering incriminating evidence not revealed prior to trial. Nor, could defense complain that exculpatory evidence was kept from Gallion, because it was shown to him and his counsel, and an opportunity given to offer it into evidence if he chose.
True, Gallion's trial strategy had been burst. But, this was a strategy he undertook wholly apart from what the tape would have revealed. Nothing the State did or said prior to trial caused or led Gallion into adopting the strategy he adopted.
At this stage of the trial, the circuit judge also quite properly directed that photographs be made of the tape for this record.

II.

DID THE MANNER IN WHICH THESE PHOTOGRAPHS WERE OFFERED INTO EVIDENCE VIOLATE RULE 4.06?
Here again, Gallion complains of something which he adopted as a defense all on his own, and brought upon himself.
Gallion had been furnished ample opportunity to examine not merely photographs from the tape, but the tape itself to ascertain whether he would benefit from exhibiting them to the jury. The State offered to recall all State's witnesses for further examination if Gallion chose. All this was declined.
The exculpatory purpose of the rule was thus fully satisfied.
Also, at this point in the trial the slate was clean. Gallion and his attorney knew precisely what the tape and photographs taken from it (ordered by the court) revealed.
It was Gallion's move. If Gallion had not then known what the photographs revealed, we could have an entirely different matter.
But Gallion and his counsel did know.
When Gallion took the stand, he proclaimed his innocence, insisted on his alibi defense, and then testified the clothes were not his, they were too small.
Had he stopped there, he would not have ensnared himself in his self-made trap. Gallion chose to go further. To demonstrate the clothes were not his, much too tight, he donned them in the presence of the jury.
These photographs were useless for identification, but they do show one thing. The clothes the robber wore were a tight fit, too.
When Gallion put these clothes on, the State could not ask for a continuance or a mistrial. Jones v. State, 398 So.2d 1312 (Miss. 1981). The State had just this one opportunity to show the clothes were tight on the robber as well.
No accused should be permitted to deliberately mislead the jury when he knows precisely that the State has in its possession evidence to contradict him, and not expect the State to offer such evidence before the jury. This was clearly rebuttal evidence under the circumstances of this case. Rule 4.06 is not a constitutional guaranty, and it should not be stretched to proportions now argued by Gallion.
A lawsuit is not simply some game. It is an adversarial proceeding in which a fair trial is guaranteed by law, with each side being prohibited from taking unfair advantage of the other.
In this case the State did not mislead or misrepresent any discovery fact to the defense. The photographs had indeed been destroyed. Defense counsel no doubt already knew before the discovery request the State had no intention of offering any photographs of the robbery into evidence, because none were offered in the first trial.
*1373 Indeed, a minimum of inquiry by counsel would have revealed that the bank had the source of any photographs.
Defense counsel chose to insinuate before the jury some sinister purpose on the part of the State in not producing the photographs.
When the district attorney, or the police department realized there was a videotape, the State had a duty to report this fact to the court in order for Gallion to determine if the tape was exculpatory. See: Foster v. State, 493 So.2d 1304 (Miss. 1986); Hentz v. State, 489 So.2d 1386 (Miss. 1986). It did this, and rather than determine whether the tape helped him or not, Gallion moved for a mistrial. The court overruled the motion for a mistrial, allowed defense counsel to view the tape and determine if it was exculpatory. Defense counsel found the tape to be precisely what the State had initially told him, worthless for identification purposes.
Gallion then chose on his own to adopt a unique defense of physically demonstrating the clothes were too tight for him. Indeed they were. The only trouble was, the clothes, as the photographs revealed, fit the robber rather tightly, too.
Discovery violations have come before our courts in disparate shapes and forms, Stewart v. State, 512 So.2d 889 (Miss. 1987), and this case is a glaring example. If this were a case of the State withholding discovery of material it reasonably could have expected might be useful as trial evidence, even though it never got around to using it except as rebuttal or for impeachment, we would have an entirely different matter. See: Coates v. State, 495 So.2d 464, 466 (Miss. 1986); Johnson v. State, 491 So.2d 834 (Miss. 1986); Tolbert v. State, 441 So.2d 1374 (Miss. 1983). This is not that case.
If the State did indeed violate Rule 4.06, it was clearly inadvertent, the State had no intention of using this evidence, and no reason to expect it to have any trial utility whatever. The defense on its own employed unique (and to the State no doubt completely unexpected) demonstrative evidence knowing full well the State had within its possession one unique way to demonstrate its falsity. It was a card the defense chose to play knowing full well what card the opponent held. This was clearly good faith rebuttal proof by the State of a trial development which the State had no reason to anticipate.
This was proper trial proceeding, and no error was committed.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and GRIFFIN, JJ., concur.
ANDERSON, J., not participating.